﻿Citation Nr: AXXXXXXXX
Decision Date: 06/20/19 Archive Date: 06/20/19

DOCKET NO. 181004-864
DATE: June 20, 2019

ORDER

The issue of entitlement to service connection for bilateral hand swelling is dismissed.

The issue of entitlement to an evaluation greater than 20 percent for bilateral hearing loss is dismissed.

Service connection for skin rash is denied.

Service connection for inguinal hernia is denied.

Service connection for asthma is denied.

Service connection for dental abscesses is denied.

Service connection for fatigue is denied.

Service connection for fibromyalgia, claimed as muscle and joint pain, is granted.

Service connection for prostate cancer is denied.

Service connection for refractive error is denied.

Service connection for respiratory chest infections with shortness of breath is denied.

Service connection for sleep apnea is denied.

An effective date prior to January 5, 2010 for the grant of service connection for chronic posttraumatic headaches is denied.

An effective date prior to October 25, 2013 for the grant of service connection for status post traumatic brain injury is denied.

An effective date prior to October 25, 2013 for the grant of service connection for tendinopathy status post ligament tear left ankle is denied. 

An effective date prior to October 25, 2013 for the grant of service connection for tendinopathy status post ligament tear right ankle is denied. 

An evaluation in excess of 30 percent for chronic posttraumatic headaches are denied.

An evaluation in excess of 10 percent for status post traumatic brain injury are denied.

An evaluation in excess of 10 percent for tendinopathy status post ligament tear left ankle are denied. 

An evaluation in excess of 10 percent for tendinopathy status post ligament tear right ankle are denied. 

An evaluation in excess of 10 percent for degenerative joint disease left knee is denied. 

An evaluation in excess of 10 percent for degenerative joint disease right knee is denied. 

An evaluation in excess of 10 percent for chronic conjunctivitis is denied.

An evaluation in excess of 20 percent for degenerative joint disease of the lumbar spine is denied.

A compensable evaluation for left foot hallux valgus is denied.

Entitlement to special monthly compensation (SMC) based on the need for aid and attendance is denied.

Entitlement to automobile or other conveyance and adaptive equipment or for adaptive equipment only is denied.

Entitlement to compensation under 38 U.S.C. § 1151 for loss of taste following VA treatment in December 2008 is denied.

FINDINGS OF FACT

1. In August 2018, prior to the promulgation of a decision in the appeal, the Board received a request from the Veteran to withdraw the issue of entitlement to service connection for bilateral hand swelling.

2. In January 2019, prior to the promulgation of a decision in the appeal, the Board received a request from the Veteran to withdraw the issue of entitlement to a rating in excess of 20 percent for bilateral hearing loss.

3. The competent evidence does not reflect a diagnosis of a skin rash disability during the appeal period.

4. Inguinal hernia was not shown in service and is not causally or etiologically related to service.

5. Asthma was not shown in service and is not causally or etiologically related to service.

6. The record does not reflect the Veteran has a current dental disorder for which compensation may be paid.

7. The competent evidence does not reflect a diagnosis of a separate and chronic fatigue disability during the appeal period.

8. The Veteran manifests fibromyalgia controlled by medication, which is deemed presumptively due to his service in the Persian Gulf.

9. Prostate cancer was not manifest during or within one year of service; and, the preponderance of the evidence fails to establish that a present disability is etiologically related to service.

10. Refractive error is not a disease or injury for VA compensation purposes.

11. A chronic respiratory disability was not shown in service and is not causally or etiologically related to service.

12. Sleep apnea was not shown in service and is not causally or etiologically related to service or to a service connected disability.

13. The Veteran’s claim for service connection for headaches was received January 5, 2010.

14. The Veteran’s claims for service connection for TBI and a bilateral ankle disability were received October 25, 2013

15. The Veteran’s posttraumatic headaches are not manifested by very frequent and prostrating and prolonged attacks that are productive of severe economic inadaptability; 

16. The Veteran’s TBI is manifested by mild memory loss.

17. The Veteran’s left ankle disability is manifested by moderate range of motion.

18. The Veteran’s right ankle disability is manifested by moderate range of motion.

19. The Veteran’s left knee disability is manifested by pain and slight limitation of motion.

20. The Veteran’s right knee disability is manifested by pain and slight limitation of motion.

21. The Veteran’s conjunctivitis is manifested by no worse than 20/50 corrected distance vision in both eyes; evidence shows that decreased visual field is the result of nonservice-connected glaucoma.

22. The Veteran’s lumbar spine disability is manifested by forward flexion limited to 70 degrees, without ankylosis of any segment of the spine or physician-prescribed bed rest.

23. The Veteran’s left foot hallux valgus is mild and has not required surgery.

24. The Veteran’s service-connected disabilities themselves do not cause the need for regular aid and attendance of another person.

25. The Veteran’s service-connected disabilities do not result in loss or loss of use of a hand or foot, permanent impairment of both eyes, severe burn injury, amyotrophic lateral sclerosis, or ankylosis of a knee or hip.

26. VA treatment in 2008 did not proximately cause residuals, including loss of taste.

CONCLUSIONS OF LAW

1. The criteria for withdrawal of the issue of entitlement to service connection for bilateral hand swelling have been met. 38 U.S.C. § 7105 (b)(2), (d)(5); 38 C.F.R. § 20.204.

2. The criteria for withdrawal of the issue of entitlement to a rating in excess of 20 percent for bilateral hearing loss have been met. 38 U.S.C. § 7105 (b)(2), (d)(5); 38 C.F.R. § 20.204.

3. The criteria for service connection for a skin rash have not been met. 38 U.S.C. §§ 1110, 1131, 5103(a), 5103A; 38 C.F.R. § 3.303.

4. The criteria for service connection for inguinal hernia have not been met. 38 U.S.C. §§ 1110, 1131, 5103(a), 5103A; 38 C.F.R. § 3.303.

5. The criteria for service connection for asthma have not been met. 38 U.S.C. §§ 1110, 1131, 5103(a), 5103A; 38 C.F.R. § 3.303.

6. The criteria for a grant of service connection for a dental (abscesses) disorder for compensation purposes have not been met. 38 U.S.C. §§ 1712, 5107; 38 C.F.R. §§ 3.381, 4.150, 17.161.

7. The criteria for service connection for fatigue have not been met. 38 U.S.C. §§ 1110, 1131, 5103(a), 5103A; 38 C.F.R. § 3.303.

8. The criteria for entitlement to service connection for fibromyalgia, claimed as muscle and joint pain, have been met. 38 U.S.C. §§ 1110, 1131, 1117, 5107; 38 C.F.R. §§ 3.317, 4.71a, Diagnostic Code 5025.

9. The criteria for service connection for prostate cancer have not been met. 38 U.S.C. §§ 1110, 1112, 1113, 1116, 1131; 38 C.F.R. §§ 3.303, 3.307, 3.309.

10. The criteria for service connection for refractive error have not been met. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. § 3.303.

11. The criteria for service connection for respiratory chest infections/shortness of breath have not been met. 38 U.S.C. §§ 1110, 1131, 5103(a), 5103A; 38 C.F.R. § 3.303.

12. The criteria for service connection for sleep apnea have not been met. 38 U.S.C. §§ 1110, 1131, 1154, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.310.

13. The criteria for an effective date earlier than January 5, 2010 for the award of service connection for chronic posttraumatic headaches have not been met. 38 U.S.C. § 5110; 38 C.F.R. § 3.400.

14. The criteria for an effective date earlier than October 25, 2013 for the award of service connection for TBI have not been met. 38 U.S.C. § 5110; 38 C.F.R. § 3.400.

15. The criteria for an effective date earlier than October 25, 2013 for the award of service connection for left ankle disability have not been met. 38 U.S.C. § 5110; 38 C.F.R. § 3.400.

16. The criteria for an effective date earlier than October 25, 2013 for the award of service connection for right ankle disability have not been met. 38 U.S.C. § 5110; 38 C.F.R. § 3.400.

17. The criteria for an initial rating in excess of 30 percent for chronic posttraumatic headaches have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.3, 4.7, 4.124a, Diagnostic Code 8100.

18. The criteria for an initial rating in excess of 10 percent for TBI have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.3, 4.7, 4.124a, Diagnostic Code 8045.

19. The criteria for an initial rating in excess of 10 percent for tendinopathy status post ligament tear left ankle have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.3, 4.7, 4.71a, Diagnostic Code 5271.

20. The criteria for an initial rating in excess of 10 percent for tendinopathy status post ligament tear right ankle have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.3, 4.7, 4.71a, Diagnostic Code 5271.

21. The criteria for an initial rating in excess of 10 percent for degenerative joint disease, left knee, have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.7, 4.71a, Diagnostic Codes 5260-5010.

22. The criteria for an initial rating in excess of 10 percent for degenerative joint disease, right knee, have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.7, 4.71a, Diagnostic Codes 5260-5010.

23. The criteria for a rating in excess of 10 percent for conjunctivitis have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. § 4.79, Diagnostic Code 6018.

24. The criteria for a rating in excess of 20 percent for degenerative joint disease of the lumbar spine have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.3, 4.7, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5242.

25. The criteria for a compensable rating for left foot hallux valgus have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. § 4.71a, DC 5280.

26. The criteria for entitlement to SMC for aid and attendance have not been met. 38 U.S.C. §§ 1114 (l), 5107; 38 C.F.R. §§ 3.102, 3.350, 3.352(a).

27. The criteria for entitlement to automobile and adaptive equipment or adaptive equipment only have not been satisfied. 38 U.S.C. § 3901, 3902, 5107; 38 C.F.R. § 3.808, 3.350(a)(2).

28. The criteria for compensation under 38 U.S.C. § 1151 for residuals of loss of taste following VA treatment in 2008 have not been met. 38 U.S.C. §§ 1151, 5107; 38 C.F.R. §§ 3.102, 3.361.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty from June 1975 to June 1978, from January 1981 to April 1992, and from May 1994 to September 1994.

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Veteran chose to participate in VA’s test program RAMP, the Rapid Appeals Modernization Program. This decision has been written consistent with the new framework.

The Veteran selected the Higher-Level Review lane when he submitted the RAMP election form in February 2018. Accordingly, the September 2018 RAMP rating decision considered the evidence of record as of the date VA received the RAMP election form. The Veteran timely appealed this RAMP rating decision to the Board and requested a hearing with evidence submission.

In January 2019, the Veteran provided testimony before the undersigned Veterans Law Judge at a Central Office hearing. The Veteran subsequently submitted additional evidence during the 90 day period following the hearing. Evidence submitted subsequent to the 90 day period will not be considered.

Under RAMP, favorable findings made by the AOJ are binding on the Board.

The Veteran submitted a request for higher-level review on February 22, 2018. The AOJ did not adjudicate the issues of entitlement to service connection for blindness, bilateral hip disability, left arm mass, erectile dysfunction, or entitlement to SMC for loss of use of creative organ included in that review request. Therefore, the Board cannot adjudicate those issues. The appellant may resubmit the review request to the AOJ or notify the AOJ that those issues are still pending.

Withdrawn Claims

The Board may dismiss any appeal which fails to allege specific error of fact or law in the determination being appealed. 38 U.S.C. § 7105. An appeal may be withdrawn as to any or all issues involved in the appeal at any time before the Board promulgates a decision. 38 C.F.R. § 20.204. Withdrawal may be made by the appellant or by his or her authorized representative. 38 C.F.R. § 20.204.

In a written statement received in August 2018, the Veteran specifically stated that he wished to withdraw the issue of entitlement to service connection for bilateral hand swelling. At his hearing before the undersigned in January 2019, the Veteran explicitly, unambiguously, and with a full understanding of the consequences, withdrew the issue of entitlement to a higher rating for bilateral hearing loss. The undersigned clearly identified the withdrawn issue, and the Veteran affirmed that he was requesting a withdrawal as to that issue. See Hearing Transcript pages 2-3. See Acree v. O’Rourke, 891 F.3d 1009 (Fed. Cir. 2018).

There remain no allegations of errors of fact or law for appellate consideration with regard to those issues. The Board does not have jurisdiction to review those issues, and dismissal is warranted.

Service Connection

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated during active service. 38 U.S.C. §§ 1110, 1131; 38 C.F.R. § 3.303 (a). Generally, in order to establish service connection, there must be competent, credible evidence of (1) a current disability, (2) in-service incurrence or aggravation of an injury or disease, and (3) a nexus, or link, between the current disability and the in-service disease or injury. See Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009).

Service connection may be established for disability resulting from personal injury suffered or disease contracted in the line of duty in the active military, naval, or air service. 38 U.S.C. § 1131. That an injury or disease occurred in service is not enough; there must be chronic disability resulting from that injury or disease. If there is no showing of a resulting chronic condition during service, then a showing of continuity of symptomatology after service is required to support a finding of chronicity. 38 C.F.R. § 3.303 (b). Service connection may also be granted for any injury or disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease or injury was incurred in service. 38 C.F.R. § 3.303 (d).

Service connection may be established for a current disability on the basis of a presumption under the law that certain chronic diseases, to include arthritis and malignant tumors, manifesting to a certain degree within a certain time after service must have had their onset in service. 38 U.S.C. §§ 1112, 1113, 1137; 38 C.F.R. §§ 3.303, 3.304, 3.307, 3.309(a).

In making all determinations, the Board must fully consider the lay assertions of record. A layperson is also competent to report on the onset and continuity of his current symptomatology. See Layno v. Brown, 6 Vet. App. 465, 470 (1994). Lay evidence can also be competent and sufficient evidence of a diagnosis or to establish etiology if (1) the layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional. Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). 

When the evidence is competent, the Board must then determine whether the evidence is credible. “Credible evidence” is that which is plausible or capable of being believed. See Caluza v. Brown, 7 Vet. App. 478, 511 (1995), aff’d per curiam, 78 F.3d 604 (Fed. Cir. 1996). If the evidence is credible, the Board, as fact finder, must determine the probative value or weight of the admissible evidence; that is, does the evidence tend to prove a material fact. Washington v. Nicholson, 19 Vet. App. 362, 369 (2005). If the evidence is not credible, the evidence may have limited evidentiary value.

1. Service connection for a skin rash.

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had a history of skin rash, with complaints noted in service.

A July 2000 treatment record noted that the Veteran had rashes under both arms. 

On a December 2010 VA examination noted a history of folliculitis of the back that was currently inactive.

VA skin examinations in July 2013 and April 2015 did not identify any skin disability other than pseudofolliculitis barbae, for which the Veteran is already service connected. A May 2014 VA examination noted no skin rashes, lesions, or ulcers.

On a July 2018 treatment record, the Veteran denied skin rashes or lesions.

The record does not contain a diagnosis of a skin rash other than pseudofolliculitis barbae, for which the Veteran is already service-connected. The threshold requirement here (as in any claim seeking service connection) is that there must be competent evidence that the Veteran has (or during the pendency of the claim has had) the disability for which service connection is sought, i.e., a skin rash disability. The record does not include any such evidence. Treatment records and VA examinations do not show a diagnosis of or treatment for a skin rash disability. Accordingly, there is no valid claim of service connection for such. Brammer v. Derwinski, 3 Vet. App. 223 (1992). In light of the foregoing, the Board concludes that the preponderance of the evidence is against the claim of service connection for a skin rash disability. Accordingly, it must be denied.

2. Service connection for an inguinal hernia

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had an inguinal hernia noted on VAMC treatment records.

The service treatment records do not show any findings or complaints of an inguinal hernia. February 1997 and November 2000 Army Reserve examinations noted normal abdomen and viscera on examination. On the November 2000 report of medical history, the Veteran denied having ever had a hernia.

A December 2010 VA examination noted no history of hernia.

A hiatal hernia was noted in June 2015. 

The Veteran testified that he has an inguinal hernia that began in service. However, his report is not consistent with the objective record, which includes normal findings in service and after, and his own denial of ever having a hernia in November 2000. Further, the Veteran’s lay opinion as to any etiology related to service has not been supported by an opinion by a medical professional. The evidence of record is against the claim. Accordingly, it must be denied.

3. Service connection for asthma

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had respiratory complaints in service and a current diagnosis of asthma.

The service treatment records do not show a diagnosis of asthma.

February 1997 and November 2000 Army Reserves examinations noted normal lung and chest on examination. On the November 2000 report of medical history, the Veteran denied having ever had shortness of breath or pain in pressure in the chest.

A June 2007 treatment record noted that the Veteran had been seen with asthma. A December 2010 VA examination report noted asthma. Chest X-ray was normal. 

A May 2015 VA examiner noted that asthma was not diagnosed in service; that he had been seen with acute bronchitis with occasional wheeze in service; that the Veteran had apparently been diagnosed with asthma sometime after service as it was listed in his list of conditions in 2002-2003; and that his chest X-ray and pulmonary function testing were normal.

The Veteran contends that he has asthma that began in service. However, his report is not consistent with the objective record, which includes normal findings in service and after, and his own denial in November 2000 of ever having shortness of breath or pain in pressure in the chest. 

Further, the Veteran’s opinion as to any etiology related to service has not been supported by an opinion by a medical professional. The evidence of record is against the claim. Accordingly, it must be denied.

4. Service connection for dental abscesses

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had dental treatment in service and current dental complaints.

Service connection may be awarded for missing teeth due to dental trauma or bone loss in service. The law and regulations also provide that treatable carious teeth, replaceable missing teeth, dental or alveolar abscesses, and periodontal disease are considered non-disabling conditions and may be considered service-connected solely for the purpose of determining entitlement to VA dental examination or outpatient dental treatment. See 38 U.S.C. § 1712; 38 C.F.R. §§ 3.381, 17.161; see also Woodson v. Brown, 8 Vet. App. 352, 354 (1995).

The Board acknowledges the service treatment records do document in-service dental treatment. However, to establish entitlement to service connection for loss of a tooth, the Veteran must have sustained a combat wound or other in-service trauma. 38 U.S.C. § 1712; 38 C.F.R. § 3.381 (b). The Board notes that the term “service trauma” does not include the intended effects of therapy or restorative dental care and treatment provided during a veteran’s active service. See 38 C.F.R. § 3.306 (b)(1); VAOGCPREC 5-97. Further, the Federal Circuit defined “service trauma” as “an injury or wound produced by an external force during the service member’s performance of military duties.” Nielson v. Shinseki, 607 F.3d 802, 808 (Fed. Cir. 2010). The definition excluded “the intended result of proper medical treatment.” Id. Here, no such trauma appears to be indicated by the service treatment records, nor does it appear the Veteran explicitly identified such in his contentions.

The Board further notes that even if the Veteran did have in-service dental trauma, only certain disabilities are subject to compensation under VA regulations. These disabilities include chronic osteomyelitis or osteoradionecrosis of the maxilla or mandible, loss of the mandible, nonunion or malunion of the mandible, limited temporomandibular motion, loss of the ramus, loss of the condyloid or coronoid processes, loss of the hard palate, loss of teeth due to the loss of substance of the body of the maxilla or mandible and where the lost masticatory surface cannot be restored by suitable prosthesis, when the bone loss is a result of trauma or disease but not the result of periodontal disease. 38 C.F.R. § 4.150, Diagnostic Codes 9900-9916. 

Here, the Veteran has indicated dental abscesses since active service. Moreover, the post-service medical records include treatment for dental problems. However, there is no evidence which documents he currently has a dental disability for which compensation may be paid under 38 C.F.R. § 4.150.

In view of the foregoing, the Board concludes the preponderance of the evidence is against the Veteran’s claim of entitlement to a dental disorder for compensation purposes, and it must be denied.

5. Service connection for fatigue

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had current complaints of fatigue.

The Board notes that the Veteran is service connected for, inter alia, posttraumatic stress disorder (PTSD) with depressive disorder, and residuals of traumatic brain injury. He has also been diagnosed with sleep apnea.

A VA examiner in December 2010 noted that the Veteran had not been diagnosed with chronic fatigue syndrome, and that his reported symptom of fatigue was “not likely to be an independent problem but a part of the symptomatology of all other claimed problems.” 

The record does not contain a diagnosis of fatigue as a separate and chronic disability. The threshold requirement here (as in any claim seeking service connection) is that there must be competent evidence that the Veteran has (or during the pendency of the claim has had) the disability for which service connection is sought, i.e., a fatigue disability. The record does not include any such evidence. Treatment records and VA examinations do not show a diagnosis of or treatment for a chronic disability manifested as fatigue. Accordingly, there is no valid claim of service connection for such. Brammer v. Derwinski, 3 Vet. App. 223 (1992). In light of the foregoing, the Board concludes that the preponderance of the evidence is against the claim of service connection for fatigue. Accordingly, it must be denied.

6. Service connection for muscle and joint pain

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had muscle and joint pain complaints, and some similar complaints in service.

The Board notes that the Veteran is service connected for degenerative joint disease of the lumbar spine, cervical spine, both ankles, and both knees. He has also been diagnosed with degenerative joint disease of the hips and shoulders.

The service treatment records note complaints of left leg swelling in July 1976 and calf pain in August 1987. 

The Veteran contends that he has fibromyalgia that is related to his periods of service.

Service connection may be granted to a Persian Gulf veteran who exhibits objective indications of a chronic disability resulting from undiagnosed illness or a medically unexplained chronic multisymptom illness that became manifest either during active military service in the Southwest Asia theater of operations during the Persian Gulf War, or to a degree of 10 percent or more not later than December 31, 2021; and, by history, physical examination, and laboratory tests cannot be attributed to any known clinical diagnosis. 38 C.F.R. § 3.317 (a)(1)(i)-(ii). 

A qualifying chronic disability means a chronic disability resulting from an undiagnosed illness or a medically unexplained chronic multisymptom illness that is defined by a cluster of signs or symptoms, such as chronic fatigue syndrome, fibromyalgia, and functional gastrointestinal disorders (excluding structural gastrointestinal diseases). 38 U.S.C. § 1117; 38 C.F.R. § 3.317 (a)(2). 

For purposes of 38 C.F.R. § 3.317, objective indications of chronic disability include both “signs” in the medical sense of objective evidence perceptible to an examining physician, and other, non-medical indicators that are capable of independent verification. 38 C.F.R. § 3.317 (a)(3). In addition, disabilities that have existed for 6 months or more and disabilities that exhibit intermittent episodes of improvement and worsening over a 6-month period will be considered chronic. 38 C.F.R. § 3.317 (a)(4).

A December 2017 VA treatment record noted a diagnosis of fibromyalgia and that the Veteran was on treatment with multiple modalities including a muscle relaxant. 

The Veteran is a “Persian Gulf War veteran” who manifests a “qualifying chronic disability” for presumptive service connection purposes: fibromyalgia. See 38 C.F.R. § 3.317 (a)(2)(i)(B)(2). He has been prescribed medication for control of fibromyalgia which meets the criteria for a compensable 10 percent rating. See 38 C.F.R. § 4.71a, Diagnostic Code 5025. As such, service connection for fibromyalgia as a disease presumptively due to Persian Gulf service has been established. 38 U.S.C. § 1117; 38 C.F.R. § 3.317. The claim is, therefore, granted.

7. Service connection for prostate cancer

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had elevated Prostate Specific Antigen and self-report of prostate cancer.

Medical evidence of record shows that the Veteran received a diagnosis of prostate cancer in June 2014. 

Prostate cancer was not shown to have been manifest during service, and a malignant tumor was not manifest within one year of service. The preponderance of the evidence also fails to establish that present prostate cancer is etiologically related to service. The medical evidence demonstrates that a diagnosis of prostate cancer was first provided in June 2014, many years after service. The diagnosis and date of onset are not in dispute.

Consideration has been given to the Veteran’s personal assertion that he has present prostate cancer is related to active service. However, while lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), the specific issues in this case fall outside the realm of common knowledge of a lay person. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007). The disability at issue is not a condition that is readily amenable to lay diagnosis or probative comment regarding etiology. See Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009); Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007). Nothing in the record demonstrates the Veteran received any special training or acquired any medical expertise. See King v. Shinseki, 700 F.3d 1339, 1345 (Fed. Cir. 2012). Accordingly, the lay evidence does not constitute competent medical evidence and lacks probative value. 

In conclusion, the Board finds that service connection for prostate cancer is not warranted.

8. Service connection for refractive error

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had a current diagnosis of refractive error.

Under 38 C.F.R. § 3.303 (c), refractive error of the eye is not considered a disease or injury within the meaning of applicable legislation governing the awards of compensation benefits. Service connection is thus not warranted for this condition.

9. Service connection for respiratory chest infections with shortness of breath 

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had current respiratory complaints and some respiratory complaints shown in service.

February 1997 and November 2000 Army reserves examinations noted normal lung and chest on examination. On the November 2000 report of medical history, the Veteran denied having ever had shortness of breath or pain in pressure in the chest.

The Veteran was treated for bronchitis in March 2010. 

A VA examiner in December 2010 noted the diagnosis of bronchitis. Chest X-ray was normal. 

A May 2015 VA examiner noted that the Veteran had been seen with acute bronchitis with occasional wheeze in service, and that his current chest X-ray and pulmonary function testing were normal. The examiner did not diagnose a respiratory condition.

In July 2018 the Veteran was treated for pneumonia. 

The Veteran contends that he has a respiratory condition that began in service. However, his report is not consistent with the objective record, which includes acute findings in service, and his own denial in November 2000 of ever having shortness of breath or pain in pressure in the chest. The May 2015 VA examiner did not find evidence of a current respiratory disability.

The Veteran’s lay opinion as to any etiology related to service has not been supported by an opinion by a medical professional. The evidence of record is against the claim. Accordingly, it must be denied.

10. Service connection for sleep apnea

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had a deviated septum shown in service and a current diagnosis of sleep apnea.

The Veteran is service connected for sinusitis and allergic rhinitis. He has contended that his sleep apnea began in service or is secondary to those disabilities.

Service connection may also be established on a secondary basis for a disability which is proximately due to or the result of service-connected disease or injury. 38 C.F.R. § 3.310 (a). Establishing service connection on a secondary basis requires evidence sufficient to show (1) that a current disability exists and (2) that the current disability was either (a) proximately caused by or (b) proximately aggravated by a service-connected disability. Allen v. Brown, 7 Vet. App. 439, 448 (1995) (en banc). Further, service connection may not be awarded on the basis of aggravation without establishing a pre-aggravation baseline level of disability and comparing it to the current level of disability. 38 C.F.R. § 3.310 (b).

February 1997 and November 2000 Army reserves examinations noted normal mouth and throat on examination. On the February 1997 and November 2000 reports of medical history, the Veteran denied having ever had frequent trouble sleeping.

The Veteran was diagnosed with sleep apnea after a sleep study in December 2006. At that time the Veteran reported a 20 year history of nightly sleep problems including trouble falling asleep and waking 10-30 times per night.

A VA examiner in December 2010 noted that the Veteran was using a CPAP for his sleep apnea. The examiner noted that treatment for sleep apnea had “helped his nasal symptoms.” 

The Veteran contends that he has sleep apnea began in service. However, there is no documentation of sleep apnea in service and he denied problems with sleep in February 1997 and November 2000. 

The Veteran contends that his sleep apnea is secondary to his service connected allergic rhinitis and sinusitis. The Veteran’s lay opinion as to any etiology related to service or to a service-connected disability has not been supported by an opinion by a medical professional. The evidence of record is against the claim. Accordingly, it must be denied.

Increased Ratings and Effective Dates

Disability ratings are determined by applying a schedule of reductions in earning capacity from specific injuries or a combination of injuries that is based upon the average impairment of earning capacities. 38 U.S.C. § 1155. Each disability must be viewed in relation to its entire history, with emphasis upon the limitations proportionate to the severity of the disabling condition. 38 C.F.R. § 4.1.

Where there is a question as to which of the two disability evaluations is applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence of record, any reasonable doubt remaining will be resolved in favor of the Veteran. 38 C.F.R. § 4.3. When the appeal arises from an initial assigned rating, consideration must be given to whether staged ratings should be assigned to reflect entitlement to a higher rating at any point during the pendency of the claim. See Fenderson v. West, 12 Vet. App. 119, 126 (1999).

When rating the Veteran’s service-connected disability, the entire medical history must be reviewed. Schafrath v. Derwinski, 1 Vet. App. 589 (1991). The Board must also fully consider the lay assertions of record. See Layno v. Brown, 6 Vet. App. 465, 470 (1994).

When evaluating musculoskeletal disabilities, VA may, in addition to applying schedular criteria, consider granting a higher rating in cases in which the claimant experiences additional functional loss due to pain, weakness, excess fatigability, or incoordination, to include with repeated use or during flare-ups, and those factors are not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45 (2016); DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995). The provisions of 38 C.F.R. § 4.40 and 38 C.F.R. § 4.45 are to be considered in conjunction with the diagnostic codes predicated on limitation of motion. See Johnson v. Brown, 9 Vet. App. 7 (1996).

Generally, except as otherwise provided, the effective date of an evaluation and award of pension, compensation, or dependency and indemnity compensation based on an original claim, a claim reopened after final disallowance, or a claim for increase will be the date of receipt of the claim, or the date entitlement arose, whichever is later. 38 U.S.C. § 5110; 38 C.F.R. § 3.400. The effective date of an original award of direct service connection is the day following separation from active service or the date entitlement arose if the claim is received within one year after separation from service; otherwise, date of receipt of claim, or date entitlement arose, whichever is later. 38 U.S.C. § 5110 (b); 38 C.F.R. § 3.400 (b)(2)(i).

11. Evaluation and effective date for chronic posttraumatic headaches

The AOJ in the September 2018 RAMP decision rendered favorable findings that the Veteran had characteristic prostrating attacks of headaches occurring on average once per month, and that his claim for service connection for headaches was received on January 5, 2010.

The Veteran is currently assigned a 30 percent rating for headaches under Diagnostic Code 8100. Under that Code, a 30 percent rating contemplates headaches with characteristic prostrating attacks occurring on an average once a month over the last several months. A 50 percent rating requires that the disability be manifested by very frequent and prostrating and prolonged attacks that are productive of severe economic inadaptability. 38 C.F.R. § 4.124a, Diagnostic Code 8100.

The rating criteria do not define “prostrating,” nor has the Court. See Fenderson v. West, 12 Vet. App. 119 (1999), in which the Court quotes Diagnostic Code 8100 verbatim but does not specifically address the matter of what is a prostrating attack. By way of reference, the Board notes that according to WEBSTER’S NEW WORLD DICTIONARY OF AMERICAN ENGLISH, THIRD COLLEGE EDITION (1986), p. 1080, “prostration” is defined as “utter physical exhaustion or helplessness.” A very similar definition is found in DORLAND’S ILLUSTRATED MEDICAL DICTIONARY 1367 (28th Ed. 1994), in which “prostration” is defined as “extreme exhaustion or powerlessness.”

The Board notes that in assigning a disability rating, “the Board may not deny entitlement to a higher rating on the basis of relief provided by medication when those effects are not specifically contemplated by the rating criteria.” Jones v. Shinseki, 26 Vet. App. 56, 63 (2012). As the rating criteria under 38 C.F.R. § 4.124a, DC 8100, do not explicitly contemplate the ameliorative effects of medication, the assigned rating for migraines should contemplate the frequency of characteristic prostrating attacks that would occur without medication.

On VA examination in December 2010 the Veteran reported having headaches four to five times per week. He treated these with over the counter medications and sat in a dark, quiet room. The Veteran was noted to be retired.

A VA examiner in June 2016 noted that the Veteran had characteristic prostrating attacks of headache pain more than once per month. He did not have very frequent and prostrating and prolonged attacks. The examiner indicated that the Veteran’s headaches impacted his ability to work in that “Veteran reports that he is not able to do anything when headaches occur.”

A 50 percent rating is not warranted unless the Veteran suffers from very frequent and prostrating and prolonged attacks that are productive of severe economic inadaptability. The Veteran has not described very frequent headaches that are productive of severe economic inadaptability, nor is his medical history consistent with very prostrating and prolonged headaches productive of severe economic inadaptability. The June 2016 VA examiner specifically found that the Veteran did not have very frequent and prostrating and prolonged attacks.

For these reasons, a higher rating is not warranted.

Furthermore, there is no basis for an earlier effective date for the grant of service connection. 

A careful review of the record shows that there is no evidence of a claim, formal or informal, or expressed written intent to file a claim for service connection for headaches prior to January 5, 2010. The legal authority governing effective dates is clear and specific, and the Board is bound by such authority. Here, based on the evidence of record and the applicable VA regulations, the earliest date allowable for the award of service connection for headaches is the current effective date of January 5, 2010, the date on which the Veteran’s claim for service connection was initially received. See 38 U.S.C. § 5110 (a); 38 C.F.R. § 3.400.

12. Evaluation and effective date for status post traumatic brain injury

The AOJ in the September 2018 RAMP decision rendered favorable findings that the Veteran had a current diagnosis and compensable symptoms of TBI, and that his claim for service connection for TBI was received on October 25, 2013.

The Veteran’s TBI is rated pursuant to 38 C.F.R. § 4.124a, DC 8045. Under DC 8045, there are three main areas of dysfunction that may result from TBI and have profound effects on functioning: cognitive (which is common in varying degrees after TBI), emotional/behavioral, and physical. Each of these areas of dysfunction may require evaluation. 38 C.F.R. § 4.124a, DC 8045.

Cognitive impairment is defined as decreased memory, concentration, attention, and executive functions of the brain. Executive functions are goal setting, speed of information processing, planning, organizing, prioritizing, self-monitoring, problem solving, judgment, decision making, spontaneity, and flexibility in changing actions when they are not productive. Not all of these brain functions may be affected in a given individual with cognitive impairment, and some functions may be affected more severely than others. In a given individual, symptoms may fluctuate in severity from day to day. Evaluate cognitive impairment under the table titled “Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified.” 

Subjective symptoms may be the only residual of TBI or may be associated with cognitive impairment or other areas of dysfunction. Evaluate subjective symptoms that are residuals of TBI, whether or not they are part of cognitive impairment, under the subjective symptoms facet in the table titled “Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified.” However, separately evaluate any residual with a distinct diagnosis that may be evaluated under another diagnostic code, such as migraine headache or Meniere’s disease, even if that diagnosis is based on subjective symptoms, rather than under the “Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified” table. 

Evaluation of Cognitive Impairment and Subjective Symptoms requires consideration of the table “Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified”, which contains 10 important facets of TBI related to cognitive impairment and subjective symptoms. It provides criteria for levels of impairment for each facet, as appropriate, ranging from 0 to 3, and a 5th level, the highest level of impairment, labeled “total.” However, not every facet has every level of severity. The Consciousness facet, for example, does not provide for an impairment level other than “total,” since any level of impaired consciousness would be totally disabling. Assign a 100 percent evaluation if “total” is the level of evaluation for one or more facets. 

If no facet is evaluated as “total,” assign the overall percentage evaluation based on the level of the highest facet as follows: 0 = 0 percent; 1 = 10 percent; 2 = 40 percent; and 3 = 70 percent. For example, assign a 70 percent evaluation if 3 is the highest level of evaluation for any facet. Id.

The 10 facets are: memory, attention, concentration, executive functions; judgment; social interaction; orientation; motor activity; visual spatial orientation; subjective symptoms; neurobehavioral effects; communication; and consciousness.

On VA examination in May 2016, the examiner identified mild memory loss, normal judgment, and routinely appropriate social interaction. The Veteran was noted to be always oriented to time, place, person, and situation. His motor activity was noted to be moderately decreased due to his disabilities of his back, ankles, and knees. The Veteran had moderately severe impairment of visual spatial orientation but was still able to drive. Subjective symptoms were noted as tinnitus, headaches, hearing loss, insomnia, and hypersensitivity to sounds and light. Neurobehavioral effects were noted as anger issues that did not interfere with his workplace or social interaction. Communication and consciousness were normal.

The Veteran’s mild memory loss is level 1. The Veteran’s motor activity impairment was related to his service connected back, ankle, and knee impairments rather to his TBI. His visual impairment was likewise attributable to eye conditions and not to TBI. His subjective symptoms of tinnitus, headaches, and hearing loss are separately compensated and thus may not be considered. His neurobehavioral effects did not interfere with workplace or social interaction.

Thus, consideration of all 10 facets showed the highest level attained was level 1 impairment of the memory, attention, concentration, executive functions facet. This corresponds to the currently assigned 10 percent rating. A higher rating is not appropriate because none of the facets, for which there is impairment shown by competent and credible evidence, warrant an assignment of more than level 1 impairment. There are no additional issues expressly or reasonably raised on the record related to this claim.

Furthermore, there is no basis for an earlier effective date for the grant of service connection. 

A careful review of the record shows that there is no evidence of a claim, formal or informal, or expressed written intent to file a claim for service connection for headaches prior to October 25, 2013. The legal authority governing effective dates is clear and specific, and the Board is bound by such authority. Here, based on the evidence of record and the applicable VA regulations, the earliest date allowable for the award of service connection for TBI is the current effective date of October 25, 2013, the date on which the Veteran’s claim for service connection was initially received. See 38 U.S.C. § 5110 (a); 38 C.F.R. § 3.400.

13. Evaluation and effective date for tendinopathy status post ligament left ankle

The AOJ in the September 2018 RAMP decision rendered favorable findings that the Veteran had a current ankle condition and painful motion, and that his claim for service connection for left ankle disability was received on October 25, 2013.

Under Diagnostic Code 5271, a 10 percent evaluation is warranted for “moderate” limitation of motion of an ankle. See 38 C.F.R. § 4.71a, DC 5271. A 20 percent evaluation is warranted for “marked” limitation of motion of an ankle. Id. Evaluations greater than 20 percent are warranted for ankylosis. See 38 C.F.R. § 4.71a, DCs 5270 and 5272. 

Normal ranges of ankle motions are 0 to 20 degrees for dorsiflexion and 0 to 45 degrees for plantar flexion. See 38 C.F.R. § 4.71, Plate II. 

The words “moderate” and “marked” are not defined in the rating schedule; rather, the Board must evaluate all the evidence to the end that its decisions are “equitable and just.” See 38 C.F.R. § 4.6.

On VA examination in May 2016, the Veteran reported instability, pain, giving out with weight-bearing, swelling, tenderness, and weakness of the left ankle during flare-ups. On examination, range of motion of the left ankle was from zero to 20 degrees of dorsiflexion, and from zero to 35 degrees plantar flexion. Pain was noted on examination and it caused functional loss. There was no additional loss of range of motion after repetitive use. The examination was conducted during a flare-up. There was no muscle loss and no ankylosis present on examination. There was no instability of the ankle.

The Veteran’s left ankle disability is manifested by reports of pain, particularly on motion. However, the objective findings from the May 2016 VA examination indicated that his range of motion even during the current flare-up was zero to 20 degrees of dorsiflexion, and zero to 35 degrees plantar flexion. The Veteran was able to perform repetitive-use testing without additional limitation of motion or functional loss. As such, the Board finds that the assigned 10 percent rating is appropriate. The objective findings are not consistent with a finding of “marked” limitation of motion of the ankle as contemplated by a higher rating under DC 5271. Further, ankylosis is not shown as required for a higher rating under DC 5270 or 5272.

Furthermore, there is no basis for an earlier effective date for the grant of service connection. 

A careful review of the record shows that there is no evidence of a claim, formal or informal, or expressed written intent to file a claim for service connection for a left ankle disability prior to October 25, 2013. The legal authority governing effective dates is clear and specific, and the Board is bound by such authority. Here, based on the evidence of record and the applicable VA regulations, the earliest date allowable for the award of service connection for left ankle disability is the current effective date of October 25, 2013, the date on which the Veteran’s claim for service connection was initially received. See 38 U.S.C. § 5110 (a); 38 C.F.R. § 3.400.

14. Evaluation and effective date for tendinopathy status post ligament right ankle

The AOJ in the September 2018 RAMP decision rendered favorable findings that the Veteran had a current ankle condition and painful motion, and that his claim for service connection for right ankle disability was received on October 25, 2013.

Under Diagnostic Code 5271, a 10 percent evaluation is warranted for “moderate” limitation of motion of an ankle. See 38 C.F.R. § 4.71a, DC 5271. A 20 percent evaluation is warranted for “marked” limitation of motion of an ankle. Id. Evaluations greater than 20 percent are warranted for ankylosis. See 38 C.F.R. § 4.71a, DCs 5270 and 5272. 

Normal ranges of ankle motions are 0 to 20 degrees for dorsiflexion and 0 to 45 degrees for plantar flexion. See 38 C.F.R. § 4.71, Plate II. 

The words “moderate” and “marked” are not defined in the rating schedule; rather, the Board must evaluate all the evidence to the end that its decisions are “equitable and just.” See 38 C.F.R. § 4.6.

On VA examination in May 2016, the Veteran reported instability, pain, giving out with weight-bearing, swelling, tenderness, and weakness of the right ankle during flare-ups. On examination, range of motion of the right ankle was from zero to 20 degrees of dorsiflexion, and from zero to 40 degrees plantar flexion. Pain was noted on examination and it caused functional loss. There was no additional loss of range of motion after repetitive use. The examination was conducted during a flare-up. There was no muscle loss and no ankylosis present on examination. There was no instability of the ankle.

The Veteran’s right ankle disability is manifested by reports of pain, particularly on motion. However, the objective findings from the May 2016 VA examination indicated that his range of motion even during the current flare-up was zero to 20 degrees of dorsiflexion, and zero to 40 degrees plantar flexion. The Veteran was able to perform repetitive-use testing without additional limitation of motion or functional loss. As such, the Board finds that the assigned 10 percent rating is appropriate. The objective findings are not consistent with a finding of “marked” limitation of motion of the ankle as contemplated by a higher rating under DC 5271. Further, ankylosis is not shown as required for a higher rating under DC 5270 or 5272.

Furthermore, there is no basis for an earlier effective date for the grant of service connection. 

A careful review of the record shows that there is no evidence of a claim, formal or informal, or expressed written intent to file a claim for service connection for a right ankle disability prior to October 25, 2013. The legal authority governing effective dates is clear and specific, and the Board is bound by such authority. Here, based on the evidence of record and the applicable VA regulations, the earliest date allowable for the award of service connection for right ankle disability is the current effective date of October 25, 2013, the date on which the Veteran’s claim for service connection was initially received. See 38 U.S.C. § 5110 (a); 38 C.F.R. § 3.400.

15. Evaluation of degenerative joint disease, left knee

16. Evaluation of degenerative joint disease, right knee

Rating criteria

Arthritis shown by X-ray studies is rated based on limitation of motion of the affected joint. When limitation of motion would be noncompensable under a limitation-of-motion code, but there is at least some limitation of motion, a 10 percent rating may be assigned for each major joint so affected. 38 C.F.R. § 4.71a, Diagnostic Codes 5003, 5010. Diagnostic Code 5010 (traumatic arthritis) directs that arthritis be rated under Diagnostic Code 5003 (degenerative arthritis), which states that degenerative arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joint or joints involved. The limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. In the absence of limitation of motion, X-ray evidence of arthritis involving two or more major or minor joint groups will warrant a 10 percent rating, and two or more major or minor joint groups with occasional incapacitating exacerbations will warrant a 20 percent rating. The 10 percent and 20 percent ratings based on X-ray findings will not be combined with ratings based on limitation of motion. 38 C.F.R. § 4.71a, Diagnostic Code 5003 Note 1.

In this case, the Veteran’s left and right knees are both rated under Diagnostic Code 5010-5260. Hyphenated diagnostic codes are used when a rating under one diagnostic code requires use of an additional diagnostic code to identify the basis for the assigned rating; the additional code is shown after the hyphen. Here, the hyphenated diagnostic code indicates that arthritis due to trauma (Diagnostic Code 5010) is rated under the criteria for limitation of leg flexion (Diagnostic Code 5260).

Limitation of motion of the knee is contemplated in 38 C.F.R. § 4.71a, Diagnostic Codes 5260 and 5261. Normal range of knee motion is 140 degrees of flexion and zero degrees of extension. 38 C.F.R. § 4.71, Plate II. 

Diagnostic Code 5260 provides for a zero percent rating where flexion of the leg is limited to 60 degrees. For a 10 percent rating, flexion must be limited to 45 degrees. A 20 percent rating is warranted where flexion is limited to 30 degrees. A 30 percent rating may be assigned where flexion is limited to 15 degrees. 

Diagnostic Code 5261 provides for a 10 percent rating requires extension limited to 10 degrees. A 20 percent rating is warranted where extension is limited to 15 degrees. A 30 percent rating may be assigned where the evidence shows extension limited to 20 degrees. For a 40 percent rating, extension must be limited to 30 degrees. Finally, where extension is limited to 45 degrees a 50 percent rating may be assigned. 

Diagnostic Code 5257 provides for assignment of a 10 percent rating when there is slight recurrent subluxation or lateral instability, a 20 percent rating when there is moderate recurrent subluxation or lateral instability, and a 30 percent evaluation for severe recurrent subluxation or lateral instability. 

VA’s General Counsel has stated that when a knee disorder is rated under 38 C.F.R. § 4.71a, DC 5257 and an appellant also has limitation of knee motion which at least meets the criteria for a noncompensable evaluation under 38 C.F.R. § 4.71a, DC 5260 or 5261, separate evaluations may be assigned for arthritis with limitation of motion and for instability. However, General Counsel stated that if an appellant does not meet the criteria for a noncompensable rating under either Diagnostic Code 5260 or DC 5261, there is no additional disability for which a separate rating for arthritis may be assigned. VAOPGCPREC 23-97 (July 1, 1997), published at 62 Fed. Reg. 63,604 (1997). If a rating is assigned under the provisions for other knee impairment (38 C.F.R. § 4.71a, Code 5257) a separate 10 percent rating may be assigned where some limitation of motion, albeit noncompensable, has been demonstrated. See VAOPGCPREC 9-98, 63 Fed. Reg. 56,704 (1998). 

VA’s General Counsel has also stated that separate ratings under Diagnostic Code 5260 (limitation of flexion of the leg) and Diagnostic Code 5261 (limitation of extension of the leg) may be assigned for disability of the same joint. VAOPGCPREC 9-04 (September 17, 2004), published at 69 Fed. Reg. 59,990 (2004).

The rating schedule also provides that dislocation of semilunar cartilage with frequent episodes of “locking,” pain, and effusion into the joint, warrants a 20 percent evaluation. 38 C.F.R. § 4.71a, DC 5258. Diagnostic Code 5259 provides for the assignment of a maximum 10 percent rating based on symptomatic removal of the semilunar cartilage. 38 C.F.R. § 4.71a, DC 5259.

Evaluation of degenerative joint disease, left knee

The AOJ in the September 2018 RAMP decision rendered favorable findings that the Veteran had a current left knee condition and complaints of pain and painful motion.

On VA examination in July 2013, the Veteran reported experiencing sharp pain, stiffness, inflammation, aching, locking, and decreased movement of the knee. 

On examination, range of motion of the left knee was from zero to 140 degrees. The examiner found no painful motion. Range of motion was unchanged after repetitive motion. The examiner described functional loss in the form of pain on movement, disturbance of locomotion, interference with sitting, and crepitance. Muscle strength testing and instability testing were normal. 

The Veteran is currently assigned a 10 percent rating based on limitation of motion under Diagnostic Codes 5010-5260. 

After reviewing the evidence of record, the Board finds that the Veteran is not entitled to a separate 10 percent rating for limited flexion under DC 5260. The VA examination report shows that the Veteran’s left knee flexion has not been limited to less than 140 degrees, even with consideration of functional loss due to pain. Flexion in the knee does not more nearly approximate 45 degrees so as to warrant assignment of a separate, 10 percent rating under DC 5260 pursuant to VAOPGCPREC 9-2004. 

The Veteran’s extension has not been limited to more than zero degrees. A separate 10 percent under DC 5261 requires extension limited to 10 degrees. 

A separate, compensable rating under DC 5257 is warranted if there is subluxation or lateral instability of the knee. Here, the evidence does not warrant a separate, compensable rating for left knee instability. The examination found no evidence of instability. As such, a compensable rating for left knee instability or subluxation is not warranted.

Evaluation of degenerative joint disease, right knee

The AOJ in the September 2018 RAMP decision rendered favorable findings that the Veteran had a current right knee condition and complaints of pain and painful motion.

Limitation of motion of the knee is contemplated in 38 C.F.R. § 4.71a, Diagnostic Codes 5260 and 5261. Normal range of knee motion is 140 degrees of flexion and zero degrees of extension. 38 C.F.R. § 4.71, Plate II. 

On VA examination in July 2013, the Veteran reported experiencing sharp pain, stiffness, inflammation, aching, locking, and decreased movement of the knee. 

On examination, range of motion of the right knee was from zero to 140 degrees. The examiner found no painful motion. Range of motion was unchanged after repetitive motion. The examiner described functional loss in the form of pain on movement, disturbance of locomotion, interference with sitting, and crepitance. Muscle strength testing and instability testing were normal. 

The Veteran is currently assigned a 10 percent rating based on limitation of motion under Diagnostic Codes 5010-5260. The criteria for these Diagnostic Codes is as set forth above.

After reviewing the evidence of record, the Board finds that the Veteran is not entitled to a separate 10 percent rating for limited flexion under DC 5260. The VA examination report shows that the Veteran’s right knee flexion has not been limited to less than 140 degrees, even with consideration of functional loss due to pain. Flexion in the knee does not more nearly approximate 45 degrees so as to warrant assignment of a separate, 10 percent rating under DC 5260 pursuant to VAOPGCPREC 9-2004. 

The Veteran’s extension has not been limited to more than zero degrees. A separate 10 percent under DC 5261 requires extension limited to 10 degrees. 

A separate, compensable rating under DC 5257 is warranted if there is subluxation or lateral instability of the knee. Here, the evidence does not warrant a separate, compensable rating for right knee instability. The examination found no evidence of instability. As such, a compensable rating for right knee instability or subluxation is not warranted.

17. Evaluation of chronic conjunctivitis

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had a history of chronic conjunctivitis.

Under Diagnostic Code 6018, a 10 percent rating is assigned for active conjunctivitis with objective findings, such as red, thick conjunctivae, mucous secretion. Inactive conjunctivitis is rated on the basis of residuals, such as visual impairment and disfigurement (Diagnostic Code 7800). 38 C.F.R. § 4.79, Diagnostic Code 6018. 

With respect to visual impairment, a 10 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 20/100 in one eye and 20/40 in the other eye; (2) corrected visual acuity is 20/70 in one eye and 20/40 in the other eye; (3) corrected visual acuity is 20/50 in one eye and 20/40 in the other eye; (4) or corrected visual acuity is 20/50 in both eyes. 38 C.F.R. § 4.79, Diagnostic Code 6066.

A 20 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 15/200 in one eye and 20/40 in the other eye; (2) corrected visual acuity is 20/200 in one eye and 20/40 in the other eye; (3) corrected visual acuity is 20/100 in one eye and 20/50 in the other eye; or (4) corrected visual acuity is 20/70 in one eye and 20/50 in the other eye. Id.

A 30 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 20/70 in both eyes; (2) corrected visual acuity is 20/100 in one eye and 20/70 in the other eye; (3) corrected visual acuity is 20/200 in one eye and 20/50 in the other eye; (4) corrected visual acuity is 15/200 in one eye and 20/50 in the other eye; or (5) corrected visual acuity is 10/200 in one eye and 20/40 in the other eye. Id.

A 40 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 20/200 in one eye and 20/70 in the other eye; (2) corrected visual acuity is 15/200 in one eye and 20/70 in the other eye; or (3) corrected visual acuity is 10/200 in one eye and 20/50 in the other eye. Id.

A 50 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 20/100 in both eyes; or (2) corrected visual acuity is 10/200 in one eye and 20/70 in the other eye. Id.

A 60 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 20/200 in one eye and 20/100 in the other eye; (2) corrected visual acuity is 15/200 in one eye and 20/100 in the other eye; or (3) corrected visual acuity is 10/200 in one eye and 20/100 in the other eye. Id.

A 70 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 20/200 in both eyes; (2) corrected visual acuity is 15/200 in one eye and 20/200 in the other eye; or (3) corrected visual acuity is 10/200 in one eye and 20/200 in the other eye. Id.

An 80 percent disability rating is warranted for impairment of central visual acuity in the following situations: (1) corrected visual acuity is 15/200 in both eyes; or (2) corrected visual acuity is 10/200 in one eye and is 15/200 in the other eye. Id.

A 90 percent disability rating is warranted for impairment of central visual acuity when corrected visual acuity is 10/200 in both eyes. Id.

Visual acuity will be evaluated on the basis of corrected distance vision. 38 C.F.R. § 4.76 (b). 

As for visual field impairment, 30 percent disability ratings are warranted for homonymous hemianopia, bilateral loss of temporal half of visual field, and for bilateral loss of inferior half of visual field. 38 C.F.R. § 4.79, Diagnostic Code 6080. 

Facial disfigurement is evaluated under Diagnostic Code 7800. Diagnostic Code 7800 provides that a 30 percent disability rating is warranted for visible or palpable tissue loss and either gross distortion or asymmetry of one feature or paired set of features, or; for two or three characteristics of disfigurement. 38 C.F.R. § 4.118, Diagnostic Code 7800.

A December 2009 VA examination noted corrected distance vision of 20/40 in both eyes. The examiner noted the Veteran had loss of visual field and tunnel vision associated with glaucoma.

On VA examination in July 2013, the Veteran’s corrected distance vision was 20/50 in each eye. The examiner noted pinguecula and dry eye syndrome of both eyes. There were no incapacitating episodes. The examiner noted itching, redness, sensitivity to light, sandy sensation, and blurred vision. The examiner noted other unrelated eye conditions including cataracts and glaucoma.

On VA examination in May 2016, the Veteran’s corrected distance vision was 20/40 or better in each eye. Slit lamp, external, and internal eye examination was normal. The Veteran had contraction of visual field. There was no loss of visual field. There were no incapacitating episodes.

Applying the facts in this case to the criteria set forth above, the Board finds that the preponderance of the evidence is against the assignment of a rating in excess of 10 percent for conjunctivitis. At the outset, the Board notes that a 10 percent rating is the maximum rating under Diagnostic Code 6018. Thus, the Board has considered whether higher ratings are warranted based on visual impairment or disfigurement.

The evidence shows that the Veteran’s impaired vision is due to nonservice-connected glaucoma and cataracts, which are not related to his service-connected conjunctivitis. Moreover, at worst, the Veteran’s corrected distance visual acuity is 20/50 in both eyes. These findings are contemplated by the current 10 percent rating; therefore, a rating in excess of 10 percent based on impairment of central visual acuity is not warranted. 38 C.F.R. § 4.79, Diagnostic Code 6066.

The Board also considered whether a higher rating is warranted based on impairment of visual fields. However, as the Veteran’s loss of visual field has been attributed to glaucoma, a higher rating is not warranted for impairment of visual fields. 38 C.F.R. § 4.79, Diagnostic Code 6080.

Additionally, there is no evidence of disfigurement or scarring of the eyes. Therefore, a rating in excess of 10 percent under Diagnostic Code 7800 is also not warranted. 38 C.F.R. § 4.118. 

The Board has considered whether a higher rating is available under any other potentially applicable provision of the rating schedule. However, the Board finds that a higher rating is not warranted for service-connected conjunctivitis based on any other provision of the rating schedule at any time throughout the period of appeal. 

The preponderance of the evidence is against a rating in excess of 10 percent for the Veteran’s service-connected conjunctivitis. Therefore, the benefit-of-the-doubt doctrine is not for application, and the claim is denied. See 38 U.S.C. § 5107 (b).

18. Evaluation of degenerative joint disease, lumbar spine

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had a current back condition and current complaints of pain and reduced ranges of motion.

Disabilities of the spine (other than IVDS when evaluated on the basis of incapacitating episodes) are to be rated under the General Rating Formula for Diseases and Injuries of the Spine. 38 C.F.R. § 4.71a, Diagnostic Codes 5235-5243 (2017). These criteria are to be applied irrespective of whether there are symptoms such as pain (whether or not it radiates), stiffness, or aching in the affected area of the spine, and they “are meant to encompass and take into account the presence of pain, stiffness, or aching, which are generally present when there is a disability of the spine.” 68 Fed. Reg. 51, 454 (Aug. 27, 2003). Any associated objective neurologic abnormalities are to be rated separately from orthopedic manifestations under an appropriate diagnostic code. 38 C.F.R. § 4.71a, Note (1) (2017).

Under the General Rating Formula, a 10 percent rating is warranted for forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; or combined range of motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; or muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or vertebral body fracture with loss of 50 percent or more of the height. A 20 percent rating is warranted for forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or, the combined range of motion of the thoracolumbar spine not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. A 40 percent rating is warranted for forward flexion of the thoracolumbar spine 30 degrees or less, or favorable ankylosis of the entire thoracolumbar spine. A 50 percent rating is warranted for unfavorable ankylosis of the entire thoracolumbar spine. Any associated objective neurologic abnormalities are evaluated separately under an appropriate diagnostic code. 38 C.F.R. § 4.71a, Note (1).

Normal forward flexion of the thoracolumbar spine is zero to 90 degrees, extension is zero to 30 degrees, left and right lateral flexion are zero to 30 degrees, and left and right lateral rotation are zero to 30 degrees. The combined range of motion refers to the sum of the range of forward flexion, extension, left and right lateral flexion, and left and right rotation. The normal combined range of motion of the thoracolumbar spine is 240 degrees. The normal ranges of motion for each component of spinal motion provided in this note are the maximum that can be used for calculation of the combined range of motion. Note (2), General Rating Formula, 38 C.F.R. § 4.71a, Plate V (2017).

Alternatively, under the IVDS Formula for intervertebral disc syndrome, a 10 percent disability rating is warranted when there are incapacitating episodes having a total duration of at least 1 week but less than 2 weeks during the past 12 months. A 20 percent rating is warranted for IVDS with incapacitating episodes having a total duration of at least two weeks but less than four weeks during the past 12 months. A 40 percent rating is warranted for incapacitating episodes having a total duration of at least four weeks but less than six weeks during the past 12 months. A maximum 60 percent rating is warranted for incapacitating episodes having a total duration of at least six weeks during the past 12 months is warranted. 38 C.F.R. § 4.71a, Diagnostic Code 5243. An incapacitating episode is a period of acute signs and symptoms due to intervertebral disc syndrome which requires bed rest prescribed by a physician and treatment by a physician. Id. 

On VA examination in July 2013, range of motion was as follows: flexion to 70 degrees; extension to 30 degrees; right lateral flexion to 30 degrees; left lateral flexion to 30 degrees; right lateral rotation to 30 degrees; and left lateral rotation to 30 degrees. Ranges were the same after repetitive motion. The examiner noted functional loss in the form of pain on movement, disturbance of locomotion, and interference with sitting, standing, or weight-bearing. There was localized tenderness. Muscle strength testing was normal. Neurological testing was normal and there was no radiculopathy. The Veteran did not have intervertebral disc syndrome. 

The July 2013 examiner noted flexion to 70 degrees, including after repetitions. The record fails to demonstrate limitation of forward flexion to 30 degrees or less or favorable ankylosis. Thus, a 40 percent disability rating is not warranted for the orthopedic manifestations of the service-connected lumbar spine disability based on objective measurements. The VA examination report did not show additional functional loss equivalent to less than 30 degrees of flexion even with consideration of painful motion, flare-ups and repetition. Thus, the Veteran’s range of motion and pain limitations are accounted for by the current 20 percent rating and a higher 40 percent schedular rating is not warranted. See DeLuca, 8 Vet. App. at 205; Mitchell, 25 Vet. App. at 36-37; see also 38 C.F.R. §§ 4.40, 4.45, 4.59, 4.71a, DC 5237. Moreover, the evidence does not show that the Veteran had any ankylosis of the thoracolumbar spine as he retained motion and it was expressly not shown on examination.

The evidence of record further fails to show any evidence of physician-prescribed bed rest and treatment due to IVDS; the July 2013 VA examiner specifically noted that IVDS was not present. Therefor a schedular disability rating in excess of 20 percent under DC 5243 is not warranted. Finally, as the evidence shows that the Veteran did not exhibit any associated objective neurologic abnormalities, a separate rating for such disabilities is not warranted.

19. Evaluation of hallux valgus, left foot

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had a current service connected foot condition and foot complaints/symptoms.

Under DC 5280, hallux valgus that has been operated on with resection of the metatarsal head or severe hallux valgus equivalent to the amputation of the great toe warrants a 10 percent disability rating. 38 C.F.R. § 4.71a, DC 5280.

The Board notes that the Veteran is separately service connected for residuals of left foot fracture, with bursitis and plantar fasciitis; the 30 percent rating for that disability is not currently before the Board.

A December 2010 VA examination noted mild hallux valgus with small bony exostosis involving the medial aspect of the first metatarsal head. X-ray showed minimal hallux valgus deformity. 

A July 2013 VA examination noted the Veteran had no symptoms of hallux valgus and he had not had any surgery for that condition. 

The Board finds that the preponderance of the evidence of record demonstrates that the Veteran’s left foot hallux valgus disability does not warrant a compensable evaluation. The Veteran has not undergone surgery for his left foot hallux valgus. Further, the December 2010 examiner described the condition as mild, while the July 2013 examiner noted there were no symptoms of hallux valgus.

Therefore, the Veteran’s hallux valgus is not manifested to a degree that more nearly approximates the criteria for a compensable disability rating for left foot hallux valgus. See 38 C.F.R. §4.71a, DC 5280.

20. Entitlement to SMC based on Aid and Attendance/Housebound

The AOJ in the September 2018 RAMP decision rendered a favorable finding that “impairment” and “need for assistance” were shown. 

Compensation at the aid and attendance rate is payable when a Veteran’s service-connected disability or disabilities cause the anatomical loss or loss of use of both feet or one hand and one foot, cause the Veteran to be blind in both eyes, or render him permanently bedridden or so helpless as to be in need of regular aid and attendance. 38 U.S.C. § 1114 (l); 38 C.F.R. § 3.350 (b).

Determinations as to the need for regular aid and attendance are factual and must be based upon the actual requirements for personal assistance from others. In making such determinations, consideration is given to such conditions as: the inability of the claimant to dress or undress himself, or to keep himself ordinarily clean and presentable; frequent need of adjustment of any special prosthetic or orthopedic appliances which by reason of the particular disability cannot be done without assistance; the inability of the claimant to feed himself through loss of coordination of upper extremities or through extreme weakness; the inability to attend to the wants of nature; or incapacity, either physical or mental, which requires care or assistance on a regular basis to protect a claimant from hazards or dangers incident to one’s daily environment. It is not required that all of the disabling conditions enumerated be present before a favorable rating is made.

The particular personal functions that the claimant is unable to perform should be considered in connection with his condition as a whole. It is only necessary that the claimant be so helpless as to be in need of regular aid and attendance, not that there is a constant need. “Bedridden” constitutes a condition which, through its essential character, actually requires that an individual remain in bed. The fact that a claimant has voluntarily taken to bed, or that a physician has prescribed bed rest for a lesser or greater portion of the day, will not suffice. 38 C.F.R. § 3.352 (a).

In Turco v. Brown, 9 Vet. App. 222, 224 (1996), the Court held that eligibility for SMC by reason of regular need for aid and attendance requires that at least one of the factors set forth in VA regulation is met. In addition, determinations that the claimant is so helpless as to be in need of regular aid and attendance will not be based solely upon an opinion that the claimant’s condition is such as would require him or her to be in bed. They must be based on the actual requirement of personal assistance from others. See Turco, 9 Vet. App. at 224. The evidence must show that the claimant is so helpless as to need regular and attendance; constant need for aid and attendance is not required. 38 C.F.R. § 3.352 (a).

A VA Form 21-2680 Examination for Housebound Status or Permanent Need for Regular Aid and Attendance, completed by a physician in July 2014, noted that the Veteran was able to feed himself and manage his own finances. He was unable to prepare meals due to PTSD and TBI residuals as well as a left arm disability. He was not able to bathe unassisted due to ankle, back, hips, knee, and foot disabilities. The Veteran was noted to be legally blind, however his corrected vision was 20/50 in each eye. He did not require nursing home care, but he did require medication management. The Veteran’s daily routine was noted to include “Sport and Health workout” from 1 to 2 pm each day.

A VA Form 21-2680 completed by a physician in October 2018 noted that the Veteran was able to feed himself and manage his own finances. He was unable to prepare meals and unable to bathe unassisted. The Veteran was noted to be legally blind, however his corrected vision was 20/50 in each eye. He did not require nursing home care, but he did require medication management. He had significant nonservice connected disabilities to include prostate cancer and lung cancer.

The evidence shows the Veteran’s service-connected disabilities impair his mobility, however, it is not evident that the assistance of another person is necessary solely as a result of the service-connected disabilities. Functionally, the Veteran can ambulate, as well as feed himself. To the extent that he needs help bathing and preparing meals, the evidence indicates that this deficit was based at least in part on his nonservice connected disabilities. Further, his legal blindness is attributable to glaucoma and cataracts that are not service-connected.

He did not require nursing home care. He was also able to manage his own financial affairs. He has multiple nonservice-connected disabilities that contribute to his overall problem with the performance of activities of daily living, to specifically include his cancer of the prostate, lung, and brain. The Veteran has been shown to be able to go to the gym.

The record does not contain any competent medical evidence that the Veteran’s service-connected disabilities, alone, render him physically helpless in the performance of the activities of daily living or in protecting himself from the everyday hazards and dangers incident to his environment. The preponderance of the evidence is against a finding that his service-connected disabilities alone result in his needing the regular aid and attendance of another person within the meaning of the cited legal authority. 

Accordingly, the evidence is against the claim for entitlement to special monthly compensation based upon the need for aid and attendance. Hence, the claim is denied.

The regulations also provide additional compensation on the basis of being housebound where the Veteran has, in addition to a single, permanent service-connected disability rated 100 percent disabling, additional service-connected disability or disabilities independently evaluated as 60 percent or more disabling which are separate and distinct from the 100 percent service-connected disability and involving different anatomical segments or bodily systems, or is permanently housebound by reason of service-connected disability or disabilities. A Veteran will be considered housebound where the evidence shows that, as a direct result of his service-connected disability or disabilities, he is substantially confined to his dwelling and the immediate premises or, if institutionalized, to the ward or clinical areas, and it is reasonably certain that the disability or disabilities and resultant confinement will continue throughout his lifetime. 38 U.S.C. § 1114 (s); 38 C.F.R. § 3.350.

Regarding the criteria necessary for housebound status, the Veteran does not have a single, permanent service-connected disability rated 100 percent disabling, nor was the Veteran’s TDIU predicated on a single disability. Therefore, he does not meet the legal criteria for payment of compensation at the housebound rate under that criterion. See 38 U.S.C. § 1114 (s); 38 C.F.R. § 3.350.

As the preponderance of the evidence is against the claim for special monthly compensation based on being housebound or needing the regular aid and attendance of another person, the benefit of the doubt doctrine is not for application and the claim must be denied. See 38 U.S.C. § 5107 (b); Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001); Gilbert, 1 Vet. App. at 55-56.

21. Entitlement to automobile or other conveyance and adaptive equipment or for adaptive equipment only

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had some impairment of the extremities not rising to the level of loss of use.

Financial assistance may be provided to an “eligible person” in acquiring an automobile or other conveyance and adaptive equipment, or adaptive equipment only. 38 U.S.C. § 3902 (a)(b). Eligibility for assistance to purchase a vehicle and adaptive equipment is warranted where one of the following exists as the result of injury or disease incurred or aggravated during active service: (1) loss or permanent loss of use of one or both feet; (2) loss or permanent loss of use of one or both hands; (3) permanent impairment of vision of both eyes, meaning central visual acuity of 20/200 or less in the better eye, with corrective glasses, or central visual acuity of more than 20/200 if there is a field defect in which the peripheral field has contracted to such an extent that the widest diameter of visual field subtends an angular distance no greater than 20 degrees in the better eye; (4) severe burn injury precluding effective operation of an automobile; (5) amyotrophic lateral sclerosis; or, (6) for adaptive equipment only, ankylosis of one or both knees or one or both hips. 38 U.S.C. § 3901; 38 C.F.R. § 3.808.

The term “loss of use of a hand or foot” is defined as existing when “no effective function remains other than that which would be equally well served by an amputation stump at the site of election below the elbow or knee with the use of a suitable prosthetic appliance.” 38 C.F.R. § 3.350 (a)(2).

The Veteran’s service-connected disabilities are: posttraumatic stress disorder with depressive disorder; tinnitus; traumatic brain injury; bilateral hearing loss; neurogenic bladder; sinusitis; allergic rhinitis; headaches; residuals of left foot fracture; degenerative joint disease of the lumbar spine, both knees, and both ankles; radiculopathy of the upper extremities; conjunctivitis; pseudofolliculitis barbae; arthritis of the cervical spine; and hallux valgus of the left foot. 

In this case, eligibility for financial assistance for automobile or other conveyance and adaptive equipment, or for adaptive equipment only, must be denied. 

While the Veteran has been noted to be “legally blind,” his corrected vision is 20/50 in each eye, and the visual impairment is attributable to glaucoma and cataracts and not to his service connected conjunctivitis. The Veteran’s service-connected disabilities have not been shown to result in loss or loss of use of any upper or lower extremity. 

The record, in short, reflects that none of the above criteria for financial assistance under 38 U.S.C. § 3902 have been met with respect to any of the Veteran’s service-connected disabilities.

The Board is bound by statutory authority and VA regulations; in this case, the Veteran simply does not meet the criteria set forth in 38 U.S.C. § 3901 and 38 C.F.R. § 3.808 for eligibility for financial assistance for automobile or other conveyance and adaptive equipment, or for adaptive equipment only, under 38 U.S.C. § 3902. Therefore, his claim for such must be denied. See 38 U.S.C. § 5107.

22. Entitlement to compensation for loss of taste under 38 C.F.R. 1151

The AOJ in the September 2018 RAMP decision rendered a favorable finding that the Veteran had current complaints of loss of taste.

Pursuant to 38 U.S.C. § 1151, compensation shall be awarded for a qualifying additional disability as if such disability were service connected. For the purposes of this section, a qualifying additional disability is one that was not the result of a veteran’s own willful misconduct and one for which there is actual and proximate causation. 38 U.S.C. § 1151. To determine whether a veteran has an additional disability, VA compares the veteran’s condition immediately before care, treatment, examination, or services, with the state of the condition after such actions have been completed. 38 C.F.R. § 3.361 (b). 

To establish actual causation, the evidence must show that the hospital care, medical or surgical treatment, or examination resulted in the veteran’s additional disability or death. 38 C.F.R. § 3.361 (c). Merely showing that a veteran received care, treatment, or examination and that the veteran has an additional disability does not establish cause. Id. Hospital care, medical or surgical treatment, or examination cannot cause the continuance or natural progress of a disease or injury for which the care, treatment, or examination was furnished unless VA’s failure to timely diagnose and properly treat the disease or injury proximately caused the continuance or natural progress. 38 C.F.R. § 3.361 (c)(2). The provision of training and rehabilitation services or CWT program cannot cause the continuance or natural progress of a disease or injury for which the services were provided. Id. 

The proximate cause of a disability is the action or event that directly caused the disability, as distinguished from a remote contributing cause. 38 C.F.R. § 3.361 (d). This may be shown through two means: (1) carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, treatment, or examination; or (2) by an event not reasonably foreseeable. 38 C.F.R. § 3.361 (d)(1)-(2). To establish that carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on VA’s part in furnishing hospital care, treatment, or examination proximately caused a veteran’s additional disability, it must be shown that the care, treatment, or examination caused the veteran’s additional disability and (i) VA failed to exercise the degree of care that would be expected of a reasonable healthcare provider; or (ii) VA furnished the hospital care, treatment, or examination without the Veteran’s, or in certain cases a designated representative’s, informed consent. 38 C.F.R. § 3.361 (d)(1).

The Veteran underwent a tonsillectomy revision (uvulopalatopharyngoplasty, or UPPP) at the Washington VAMC on December 5, 2008. 

In January 2009 the Veteran was noted to be able to take a soft diet. At that time, he complained of larger food getting hung in his throat. A modified barium swallow was conducted which showed mild pharyngeal dysphagia. The Veteran was to continue taking solids in small pieces, with liquids. In March 2009 the Veteran noted that his sleep apnea symptoms were resolved and that he was happy with the results of the surgery but frustrated by the difficulties with swallowing. In May 2009 the Veteran reported decreased taste to certain foods such as soft drinks and hamburgers. Follow-up in July 2009 noted the Veteran reported that his taste was slowly improving.

The Veteran testified before the undersigned that he experienced loss of taste following the December 2008 surgery. He contends that the doctors may have used unsterile equipment while operating on him. He has submitted to competent evidence to substantiate that claim.

The evidence of record does not establish that the Veteran suffered additional disability in the form of loss of taste as a result of the VA surgery in December 2008. There is no medical evidence attributing a permanent loss of taste to the surgery. Further, his taste was noted to be improving in July 2009. 

There is no showing that there was any carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the December 2008 surgery. 

Because the preponderance of the evidence is against the claim, the benefit of the doubt doctrine does not apply, and the claim for compensation under 38 C.F.R. §1151 must be denied. 38 U.S.C.A. § 5107 (b); Gilbert v. Derwinski, 1 Vet. App. 49 (1990); Ortiz v. Principi, 274 F. 3d 1361 (Fed. Cir. 2001).

 

D. JOHNSON

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD M. G. Mazzucchelli, Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.